IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

ABIGAIL FARELLA and LOGAN W.        )
MURPHY, on behalf of themselves     )
and all others similarly           )
situated,                          )
                                   )
            PLAINTIFFS,            )   CASE NO.
                                   )   5:22-CV-05121-TLB
VS.                                )
                                   )
DISTRICT JUDGE A.J. ANGLIN;        )
GREGG PARRISH EXECUTIVE DIRECTOR   )
OF ARKANSAS PUBLIC DEFENDER        )
COMMISSION; JAY SAXTON, CHIEF      )
BENTON COUNTY PUBLIC DEFENDER,     )
                                   )
            DEFENDANTS.            )

------------------------------------

ORAL DEPOSITION OF

A.J. ANGLIN

April 5, 2024

------------------------------------

        ORAL DEPOSITION OF A.J. ANGLIN, produced as a

witness at the instance of the PLAINTIFFS, and duly

sworn, was taken in the above-styled and numbered

cause on the 5th day of April, 2024, from 10:15 a.m.

to 12:38 p.m., before Dana Hayden, CCR in and for the

State of Arkansas, RMR, CRR, CRC, reported by machine

shorthand, at Friday, Eldredge Clark, Rogers,

Arkansas, pursuant to the Federal Rules of Civil

Procedure.

**EXHIBIT 1**



**ARKANSAS**
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

```
 1                        APPEARANCES

 2    FOR THE PLAINTIFFS:

 3       Mr. Doug Norwood
         Ms. Alison Lee
 4       Norwood & Norwood, P.A.
         2001 South Dixieland Road
 5       Rogers, Arkansas 72758
         (479) 235-4600
 6       Doug@norwoodattorneys.com
         Alison@norwoodattorneys.com
 7

 8    FOR THE DEFENDANT DISTRICT JUDGE A.J. ANGLIN:

 9       Ms. Christine Cryer
         Mr. Justin Brascher
10       Arkansas Attorney General's Office
         323 Center Street, Suite 200
11       Little Rock, Arkansas 72201
         (501) 682-2029
12       Christine.cryer@arkansasag.gov

13

14    FOR THE DEFENDANTS GREGG PARRISH, EXECUTIVE DIRECTOR
      OF ARKANSAS PUBLIC DEFENDER COMMISSION; JAY SAXTON,
      CHIEF BENTON COUNTY PUBLIC DEFENDER:
15
         Ms. Katherine C. Campbell
16       Friday, Eldredge & Clark, LLP
         3350 S. Pinnacle Hills Parkway, Suite 301
17       Rogers, Arkansas 72758
         (479) 695-6040
18       Kcampbell@fridayfirm.com

19

20    ALSO PRESENT:

21       Mr. Gregg Parrish

22       District Judge A.J. Anglin

23

24

25
```



FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024

3

```
 1                    I N D E X

 2                  April 5, 2024

 3                                              PAGE:

 4   Stipulations                                1

 5   Appearances                                 2

 6   Reporter Certification                     103

 7   WITNESS: A.J. ANGLIN

 8      Examination By Mr. Norwood               4

 9      Examination By Ms. Campbell             79

10      Further Examination By Mr. Norwood      93

11      Examination By Ms. Cryer                96

12      Further Examination By Mr. Norwood      99

13      Examination By Ms. Lee                 100

14
                         EXHIBITS
15
     NO.            DESCRIPTION              MARKED
16
     Exhibit 1      Court documents regarding    65
17                  Logan Murphy

18   Exhibit 2      Sentencing Order regarding   65
                    Logan Wade Murphy
19
     Exhibit 3      Court documents regarding    65
20                  Abigail Farella

21   Exhibit 4      Sentencing Order regarding   65
                    Abivail E. Farella
22
     Exhibit 5      Redacted No Contact          69
23                  Order/Conditions of Release
                    regarding State of Arkansas
24                  v. Bryan Alarcon

25   Exhibit 6      Affidavit of Indigency form  77
```

ARKANSAS
REALTIME REPORTING                    www.ArkansasRealtimeReporting.com

```
                        ***** PROCEEDINGS *****

 1

 2                          A.J. ANGLIN,

 3    having been first duly sworn, testified as follows:

 4                            EXAMINATION

 5    BY MR. NORWOOD:

 6    Q.    Okay.  I'm going to be very, very careful about

 7    not just referring to you as "A.J."  I mean, me and

 8    you have known each other for a long time.  I'll do my

 9    best to not do that.

10              So, your Honor, please tell us.  Give us

11    your background and your employment, law school, that

12    kind of stuff.

13    A.    So in law school, I worked for Jim Lingle at the

14    Lingle Law Firm in Rogers.  That was where I did my

15    clerk job when I was in law school.  So I worked, at

16    least I think 2L and 3L for Jim Lingle.  So that was

17    my employment in law school.

18              Then when I graduated from U of A, I

19    worked for a firm in Mississippi, and we had the Legal

20    Aid contract for Simpson County.  So I was a Legal Aid

21    attorney through a contract.  I didn't get a paycheck

22    from Legal Aid, but I was with a small firm and the

23    firm had the contract.  And so the majority of our

24    work was Legal Aid work.

25              We had a 1983 case that I filed on a
```

Time stamps in left margin:
- Line 5: 10:15AM
- Line 10: 10:16AM
- Line 15: 10:16AM
- Line 20: 10:16AM
- Line 25: 10:17AM

1    housing authority.  We represented indi- -- you know,

2    poor-income people and so I did legal services.

3              Then after that, I was in law

4    enforcement in the State of Mississippi for a short

10:17AM    5    time, before I came back and I went to Siloam Springs

6    Police Department.

7              So I was with Siloam Springs Police

8    Department for seven years.  And when I was with

9    Siloam, I was on patrol and then eventually, I moved

10:17AM   10    to the CID, the detective division.  So I was with

11    Siloam Springs Police Department for seven years, from

12    1996 to 2003.

13              2003, on a Friday, I was a cop, and on

14    Monday, I was a deputy prosecutor.  So I went straight

10:17AM   15    from the police department to Benton County

16    Prosecutor's Office.  Eventually I ended up being the

17    Division 1 chief deputy of Division 1.  Then later I

18    was moved to Division 3, which is the juvenile

19    division.  So I was moved from 1 to 3.  So I, of

10:18AM   20    course, supervised more attorneys in Division 1 than I

21    did in Division 3, but I was transferred to another

22    division.

23              Then I did two years with Drew Miller's

24    law firm.  So then I did defense attorney work, and I

10:18AM   25    represented people on felonies and misdemeanors.  And



www.ArkansasRealtimeReporting.com

1    then I was elected judge.

2            So the summary is I've been a clerk for

3    Jim Lingle, I've done legal services, I've been a

4    police officer, I've been a prosecutor, I've been a

10:18AM   5    defense attorney, and I've been a judge now for three

6    years.

7            And so I have basically been reviewing

8    affidavits of probable cause or preparing them myself

9    for quite a while now.  So that's my experience.  It

10:19AM   10   goes from the private sector into government work,

11   back to private sector and now I'm the elected judge

12   for the next four years because I didn't have an

13   opponent.  So I'm now the judge, but I'm the elected

14   judge because when January 1st hits, I'll be serving

10:19AM   15   my second term.

16   Q.    Okay.  How is it --

17   A.    As a district judge.

18   Q.    How is it that you came to be doing felony bond

19   hearings?  I know that you do misdemeanor bond

10:19AM   20   hearings because some of these misdemeanors are in

21   your own court, but you do felony ones.

22   A.    So --

23   Q.    Tell me how that happened.

24   A.    Administrative Order 18 is issued by the Supreme

10:19AM   25   Court, and the Administrative Order 18 lists specific



ARKANSAS
REALTIME REPORTING                                    www.ArkansasRealtimeReporting.com

```
   1   things that district judges can do.  And on the

   2   criminal side it has a list, and it says, "Issue

   3   arrest warrants, issue search warrants, conduct 8.1

   4   bond hearings."

10:20AM  5            It allows district judges to do

   6   arraignments if it's a not guilty plea or not guilty

   7   by reason of insanity.  It allows district judges to

   8   do preliminary hearings under a certain statute.

   9            So Administrative Order 18, which hasn't

10:20AM 10   really changed in quite a while, has this list, and it

  11   even has some type of other that it allows to happen.

  12   And so the Supreme Court is very specific on what you

  13   can do.

  14            That being said, the circuit judges in

10:21AM 15   this current admin- -- their administrative order and

  16   then in the one prior specifically has every one of

  17   those listed, and it has either a check you can do it

  18   or you can't.  And so there's a check that says

  19   district judges can issue search warrants, they can

10:21AM 20   issue arrest warrants, they can cause a summons to be

  21   issued, they can do -- under the administrative order

  22   that Tom Smith, Judge Green, and all the circuit

  23   judges sign, I can -- district judges can do all those

  24   things.

10:21AM 25            It also included extradition hearings,
```



1   so that's in an administrative order that's signed

2   every two years.  However, it specifically does not

3   permit district judges to do arraignments.

4                   Now, even if you could do an

10:21AM   5   arraignment, all you can take is a not guilty plea or

6   a not guilty plea by insanity.  But the district

7   judges were not given that authority and never have.

8   And so there's one particular box that is not marked,

9   and that is the taking a not guilty plea.  So we

10:22AM   10   cannot do that.  We can't take a not guilty plea.

11                   The Supreme Court said you can't take a

12   guilty plea, but they said you can do not guilty

13   pleas.  But the circuit judges have not given the

14   district court judges that authority because it's not

10:22AM   15   marked.

16                   In addition, the district judges, under

17   the current administrative plan that all circuit

18   judges have been signing for years now, also does not

19   allow district judges to do preliminary hearings under

10:22AM   20   a statute number.

21                   So there's two specific things that the

22   circuit judges have said, "You can't do that."  That

23   being said, it's been that way for 25 years, at least

24   since 2000.  And then when I did bond hearings --

10:22AM   25   recommendations for Judge Clinger.  It's always been



| | |
|---|---|
| 1 | this way.  But what has happened since I've been a |
| 2 | district judge, it's all been put into the |
| 3 | administrative order in detail, and so it's at the |
| 4 | back end of that. |
| 10:23AM  5 | When the circuit judges divide up their |
| 6 | docket, I get 50 criminal, you get 50 criminal, |
| 7 | referring to Green and Karren, and then they have all |
| 8 | their divisions.  All that information is in there. |
| 9 | But if you get to the back of the order, it |
| 10:23AM 10 | specifically explains what the district judges can do. |
| 11 | So that's the authority from the Supreme |
| 12 | Court.  Then the circuit judges have say over it and |
| 13 | then the circuit judges have left those two things |
| 14 | out.  And then all the district judges every year, we |
| 10:23AM 15 | sign our administrative order, which is a district |
| 16 | judge administrative order, and then we mirror what |
| 17 | the circuit judges say. |
| 18 | And so we don't allow, in the district judge |
| 19 | order, us to do arraignments and we can't do |
| 10:24AM 20 | preliminary hearings pursuant to a statute number. |
| 21 | And so we just automatically are mirroring.  So the |
| 22 | circuit judge administrative order, which is 19th West |
| 23 | is just, like, district court. |
| 24 | And I'll just tell you that if you go on |
| 10:24AM 25 | the website right now, you can go Supreme Court |



ARKANSAS
REALTIME REPORTING                    www.ArkansasRealtimeReporting.com

1  administrative order, go to Judicial 19th West, and

2  it's there.  If you go to the district, it's on the

3  website and it's there.

4             And so we have administrative orders who

10:24AM  5  then have to be approved by the Supreme Court justice,

6  chief justice.  So we can't just submit them and it's

7  done.  We have to actually get those approved, and it

8  doesn't happen overnight.  We have to submit them by,

9  like, by July 1st, and it gives the Supreme Court

10:24AM  10  justice six months because it's going into effect on

11  that January 1st date.

12             So that's a long explanation, because I

13  think it's important, to say that we are only

14  conducting hearings that we have judicial authority

10:25AM  15  from the Supreme Court and from the circuit judges.

16  Q.    Okay.  Let's -- so that we have the record

17  right, let's figure out who the players are.  Okay.

18             If I understand it right, there are two

19  circuit judges that do felony criminal cases in Benton

10:25AM  20  County?

21  A.    And they are divided 50/50.  That would be Judge

22  Robin Green, Judge Karren, and their administrative

23  order says that they get every criminal case and it's

24  divided 50/50.

10:25AM  25  Q.    Okay.  So this is Judge Brad Karren, Circuit

1    Judge Brad Karren and Circuit Judge Robin Green?

2    A.    That is correct.

3    Q.    And the juvenile judge is Circuit Judge Thomas

4    Smith.

10:25AM  5    A.    Right.  And he gets juvenile cases.  He gets

6    adult drug court.  So he gets felony cases when it's

7    in a specialty court or drug court.  So he does get

8    felony cases, but they are under the transfer order,

9    and he does all the drug court cases.  And then he has

10:26AM  10    DHS and some other duties.

11           But he only handles, Judge Tom Smith, a

12    felony, if it's going through a specialty court like

13    drug court unless under the rare occasion there's a

14    recusal by Judge Green and a recusal by Judge Karren.

10:26AM  15    It's always possible a single criminal case to get

16    recused to a judge who's not Judge Karren and Judge

17    Green through a recusal.

18           But in terms of nondrug court cases, it's

19    all Judge Karren or all Judge Green.

10:26AM  20    Q.    Okay.  Now, our fourth district court judges,

21    you being one of those four, correct?

22    A.    That is correct.

23    Q.    Tell me who they are.

24    A.    So the four district judges, all of them are

10:26AM  25    elected.  We're not talking about appointments.

1    Division 1 is Judge Chris Griffin, and he's out of

2    Rogers.

3                    Then we have Division 2.  That's Judge Ray

4    Bunch, and he's out of Bentonville, but he does

10:26AM  5    additional courts, but Bentonville is the -- is his

6    biggest court.

7                    Division 3 is Benton County West.  That's

8    Judge Jeff Conner.  And Judge Jeff Conner does -- in

9    addition to Benton County West, he also does

10:27AM  10    Centerton, and he does Little Flock.

11                    And then Division 4 is myself, Judge

12    Anglin.  And I actually have Siloam Springs, civil and

13    criminal.  I do all of the civil docket in Benton

14    County West.  I do all of the civil docket in Rogers

10:27AM  15    District Court.

16                    And then, of course, we all have a 25

17    percent amount of the bond hearings at the jail.  And

18    it says "25 percent," and the way we do it is we do a

19    one-week rotation.  So you're generally on a week, off

10:27AM  20    three weeks.  And so we're doing 25 percent, which is

21    13 weeks a year, and we divide it up by a week basis.

22                    There's no assignment by random.  It's

23    based upon we do a week and whoever that person is

24    during that week, we get everybody from a Saturday

10:28AM  25    morning to the next Friday.

             1                And that yearly calendar, we issue that

             2    before the year starts.  So when we hit January 1st,

             3    we have the entire calendar year mapped out on who the

             4    bond judge is, and occasionally we will cover each

10:28AM      5    other for a day because Judge Ray Bunch has had a

             6    surgery, had a medical procedure and I've had to

             7    cover.

             8                But generally we stick to it unless

             9    somebody has to trade out a full week, or maybe one of

10:28AM     10    us might cover the other judge for a day.

            11    Q.     Whenever you do a -- so you're doing bond

            12    hearings -- bail hearings.  We'll just call them all

            13    bail hearings even though they're pretrial release.

            14    A.     Well, they're first appearances.

10:28AM     15    Q.     Okay.  Now, when you do them for misdemeanor

            16    court, then -- for any of the misdemeanor court.  So

            17    that means if anybody's arrested for a misdemeanor,

            18    even if it's not going to be in your court, you're

            19    doing that bail hearing, right?

10:29AM     20    A.     I am, and there's ten.

            21    Q.     Okay.

            22    A.     There's ten courts that are misdemeanor courts.

            23    So we're doing bond hearings for potentially twelve

            24    courts every time we go to a bond hearing.  Obviously

10:29AM     25    Division 1, Division 2 is a large majority, but



FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024
**14**

| | |
|---|---|
| | 1 |

there's also ten other courts that we're doing bond

2   hearings for.  So there's a total of 12 potential

3   courts that we could be assigning people a court date.

4   Q.    How many misdemeanor cases do you think that you

10:29AM  5   do in your week-long stint, just roughly?

6   A.    So I would say that normally there's around 18,

7   maybe 20 a day.

8   Q.    Misdemeanors?

9   A.    Total, for the whole day, for that -- for a

10:29AM  10  single day, we normally have around 18, maybe 20, and

11  we do it for seven days.  So I would estimate that we

12  do about 120, 130 a week.  That would just be a rough

13  estimate.  An average week, we're doing 120 or 130

14  cases of bond hearings.

10:30AM  15       So if you're asking how many misdemeanor

16  cases, I would say that the percentage would be around

17  a third.  And so just a guess, I would say we're

18  normally doing around 40 misdemeanors and about 75

19  felonies and about five extraditions.

10:30AM  20  Q.    When you're doing the felony cases, are you

21  doing that as -- I mean, do you get elevated as a

22  circuit judge to do that, or are you still, throughout

23  that whole process, a district judge?

24  A.    So we are, through Administrative Order 18, we

10:31AM  25  are now performing under the Supreme Court's



1   Administrative Order 18.   So that's the mechanism that

2   we're performing under, as a judge under

3   Administrative Order 18.

4   Q.    Okay.   So, but you're representing the circuit

10:31AM  5   court in a felony case?   Even though you're a district

6   judge, it's actually --

7   A.    We're performing -- we're performing what is a

8   circuit judge's role.

9   Q.    Okay.   That's what I'm trying to get to.

10:31AM  10   A.    So we're performing their role.   Because

11   obviously they could come in and do all the bond

12   hearings if they wanted.

13   Q.    Why don't they?

14   A.    If Judge Green -- I don't know.   But if they

10:31AM  15   wanted, they could come in and they could do all the

16   bond hearings.   So we're performing the duty of a

17   circuit court judge.   I'm not here saying that we are

18   circuit judges.

19   Q.    No, I understand.

10:32AM  20   A.    I'm just saying we're performing their duty.

21   And so we have to be operating under Administrative

22   Order 18 to be doing it under -- to be performing

23   their duty, we have to do it under Administrative

24   Order 18.   And the reason I tell you that is there's

10:32AM  25   things that I refuse to do, and law enforcement has

1   not liked it, and that is I will not destroy evidence

2   or assign an evidence destruction order on a felony

3   case.  I won't sign a destruction order if someone

4   finds methamphetamine out on the road and turns it in

10:32AM   5   and is just like, "Okay, let's destroy it."  I say, "I

6   don't have authority to destroy evidence in a felony

7   investigation or in a felony arrest."

8              So I tell you that that I am very

9   cautious that I am only performing their duty under

10:32AM   10   those specifically outlined areas, and I will not

11   perform their duty outside it, and I will not quash a

12   felony warrant even if I issued it.  And if I issued

13   the warrant, I have authority.

14              I have no authority to quash felony

10:33AM   15   warrants.  So when they make a mistake and they say,

16   "Judge, will you quash it," I say, "No, take it to a

17   circuit judge."  I don't have any authority to quash a

18   felony warrant even though I issued it because I'm

19   going strictly under Administrative Order 18.

10:33AM   20   Q.    Okay.  Got it.  Now, we've talked a little -- or

21   the plaintiffs have talked a little bit about the

22   facilities at the jail.  There's actually a courtroom

23   in the jail, in the Benton County Jail, isn't there?

24   A.    There is a courtroom.  It has a judge's -- a

10:33AM   25   judge's seat, which is elevated.  It has not permanent



1    seating, but it has approximately 12 or 13 chairs for

2    people to sit at.  They're not permanent chairs, but

3    they're brought-in chairs.  And so there is seating

4    for 12 or 13 people in the courtroom, that can

10:34AM    5    actually sit down.

6    Q.    What time are the bail hearings conducted?

7    A.    So my bail hearings are conducted at 6:00 a.m.

8    or a little bit later.  And so for the purpose of me

9    having access to that courtroom and not running into a

10:34AM    10    conflict with Division 1 and Division 2, I conduct the

11    bond hearings at 6:00 a.m.

12                I've had a discussion with the circuit

13    judges at a monthly meeting, and I was inquiring if I

14    could do bond hearings at a later time, and I was

10:34AM    15    instructed that from 9:00 a.m. until 3:00 p.m., it's

16    Division 1 and Division 2.

17                So I have been conducting them at 6:00

18    because Judge Thomas was doing it that way, that's the

19    way Judge Griffin does it, and it has some major

10:35AM    20    benefits.  And one benefit is if I have a bond hearing

21    at 6:00 a.m. and I'm citing someone out, they are much

22    happier to get out at 6:30 than they are a.m. than

23    6:30 p.m.

24                It also benefits the staff at the jail

10:35AM    25    because they are not trying to get the Division 1



ARKANSAS
REALTIME REPORTING                    www.ArkansasRealtimeReporting.com

|        |    |                                                                    |
|--------|----|--------------------------------------------------------------------|
|        | 1  | inmates to Division 1 or doing video while I'm doing               |
|        | 2  | court.                                                             |
|        | 3  | And then thirdly, if I do a bond hearing                          |
|        | 4  | at 6:00 a.m., many times that case has a file mark                |
| 10:35AM| 5  | before noon and it's been officially assigned to a                |
|        | 6  | judge within hours of me doing the bond hearing.  If I            |
|        | 7  | did a bond hearing at 6:00 p.m., it wouldn't get                  |
|        | 8  | assigned to a circuit judge until the next day.                   |
|        | 9  | So by me having a bond hearing at 6:00                            |
| 10:35AM| 10 | a.m., generally it will be filed with the clerk and it            |
|        | 11 | will be assigned either Judge Karren or Judge Green               |
|        | 12 | within hours of the bond hearing.  That's if it's                 |
|        | 13 | during the week.                                                  |
|        | 14 | Now, if it's on a weekend, the clerk's                            |
| 10:36AM| 15 | not there.  Mondays, they may be a little behind                  |
|        | 16 | because they have to pick up Saturday and Sunday.  But            |
|        | 17 | I do it at 6:00 a.m. because it works for the jail                |
|        | 18 | staff, it doesn't conflict with Judge Green and Judge             |
|        | 19 | Karren, it's beneficial for the prosecutor's office to            |
| 10:36AM| 20 | get everything file-marked and the clerk to get it                |
|        | 21 | assigned to a circuit judge.                                      |
|        | 22 | It also allows the defendants or the                              |
|        | 23 | detainees to get out earlier if they can bond or if               |
|        | 24 | they can get cited out.                                           |
| 10:36AM| 25 | So I'm not saying that everybody likes                            |



1    it that it's at 6:00 a.m., but there are a lot of

2    benefits to it, and I've been told that the courtroom,

3    if I show up at 9:00 and it's being used by

4    Division 1, then it's Division 1's courtroom, and then

10:37AM   5    I would have to reschedule the bond hearing until

6    later in the day.

7              So to avoid a conflict, I always try to

8    start them at 6:00.  With that being said, I get there

9    at 5:00 a.m. so I can read the affidavits before any

10:37AM  10   inmates are brought in.

11   Q.    What is the downside to this?

12   A.    The downside is that it may be more difficult

13   for a private attorney to get up in the morning

14   because some people aren't morning people, and there's

10:37AM  15   some people that don't want to go to work at 6:00 a.m.

16   I understand that.  Some people like working at 6:00

17   a.m. because they can get out of the house quick and

18   beat the traffic.  Some people don't want to get up at

19   6:00 a.m.

10:37AM  20             So it just goes to life in terms of some

21   people don't want to go to work at 6:00 a.m., and if

22   you're a private attorney, you may not want to go to

23   work at 6:00 a.m.  I understand that.  If you're a

24   public defender, you may not prefer to be at work at

10:37AM  25   6:00 a.m., and I understand that there may be people



| | |
|---|---|
| 1 | that don't like it that early. |
| 2 | I have inquired to move it later in the |
| 3 | day, and that's not an option unless I would wait |
| 4 | until 3 o'clock p.m.  So I would have to wait until |
| 10:38AM  5 | 3:00 p.m., which means people would have -- if they |
| 6 | are being cited out, they would be in jail an extra |
| 7 | nine hours. |
| 8 | Q.    Do you -- when you say the courtroom's not |
| 9 | available, you're talking about the courtroom in the |
| 10:38AM  10 | main part of the big courthouse downtown? |
| 11 | A.    I'm saying that the courtroom in the jail is |
| 12 | often used for video court, often. |
| 13 | Q.    Okay.  I understand. |
| 14 | A.    And so if I show up and it's being used, then I |
| 10:38AM  15 | can't use it.  If I'm in there and I start my bond |
| 16 | hearings at 9:00, and at 9:30, Judge Green wants the |
| 17 | courtroom, she wants the courtroom and so we have a |
| 18 | conflict. |
| 19 | And I've talked to the circuit judges |
| 10:39AM  20 | about it, and I've been told between 9:00 a.m. and |
| 21 | 3:00 p.m. that Division 1 and 2 have priority. |
| 22 | Another nice way of saying it is you can |
| 23 | use the courtroom before 9:00 or after 3:00, but |
| 24 | another way of saying it is we have priority between |
| 10:39AM  25 | 9:00 and 3:00.  And so I've had a discussion at the |



1    monthly meeting, and I was told Division 1/Division 2

2    have priority in getting that courtroom.

3    Q.    Whenever -- have you ever talked to the public

4    defender's office?  Jay Saxton is the chief public

10:39AM    5    defender in Benton County, correct?

6    A.    Yes.

7    Q.    Have you ever talked to him about having any of

8    his people there at 6 o'clock in the morning?

9    A.    I have not asked about 6:00 a.m.  I have had

10:39AM    10    Seth Irwin, a deputy public defender, show up at 6:00

11    a.m.  So I've had a deputy public defender come at

12    that time, but I've not asked Jay Saxton about it.

13    But I have had a deputy public defender show up.

14    Q.    How often do any lawyers show up?

10:40AM    15    A.    I think that I've had Stuart Cearley, Ryan

16    Renauro, Tom Marks.

17    Q.    Would you say it's infrequent?

18    A.    It is about -- I do bond hearings every -- I do

19    13 bond hearing weeks.  I would say I have a private

10:40AM    20    attorney show up about half of the weeks, if less than

21    that.

22             So, in other words, if I'm doing 13 weeks,

23    there will probably be seven or five of the weeks that

24    there will be no private attorneys or public

10:41AM    25    defenders.  So it's just basically never day after day



FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024                                                    22

```
 1   after day, but it is every few of my rotations, I'll

 2   have a private attorney come in.  It may be like --

 3   Q.    Okay.

 4   A.    -- three or four rotations.

 5   Q.    Okay.  You know this lawsuit is about

 6   prospective relief in the future to try to get

 7   somebody to produce public defenders at these bail

 8   hearings.

 9   A.    Which I wish the public defenders were there.  I

10   would prefer that, and I would welcome that.  And I

11   told Seth Irwin when he showed up that I was glad he

12   was there, and I always welcome the public defender to

13   be at the bond hearings, and I would prefer that they

14   were at bond hearings.  I think that would be

15   beneficial, and I think that would be something that

16   would be beneficial for the judicial system.

17              So I'm definitely for it.  The problem

18   is I don't have the authority to sign an order telling

19   them that if they -- they have to show up and then

20   issue a contempt if they don't.  I don't have the

21   authority to force them to show up.  I don't have that

22   authority.

23              And so I can voluntarily ask and make

24   the statement "I would like for you to be there," but

25   I can't actually write a court order telling them that
```

10:41AM (line 5)
10:41AM (line 10)
10:41AM (line 15)
10:42AM (line 20)
10:42AM (line 25)

| | |
|---|---|
| 1 | it's court-ordered that they be at mine. |
| 2 | That would be something that I talked to |
| 3 | Judge Tom Smith about, the fact that we don't have |
| 4 | public defenders, and Judge Tom Smith is aware.  I |
| 10:42AM  5 | talked to him about it.  I told him I prefer it, and |
| 6 | it's something that I've talked to the administrative |
| 7 | judge about it like I have other things, and it hasn't |
| 8 | happened. |
| 9 | But the administrative judge is someone |
| 10:43AM 10 | that is over all of us district judges, and I've had |
| 11 | discussions with him, and he knows I would prefer it, |
| 12 | but that would be something the administrative judge |
| 13 | could also have some say over because he has authority |
| 14 | over us.  We report directly to the administrative |
| 10:43AM 15 | judge, and that's pursuant to Administrative Order 18. |
| 16 | Q.    Do they record the bond hearings now? |
| 17 | A.    When I went to the judges' meeting and I told |
| 18 | them we were past January 1st and we don't have a |
| 19 | recording system in.  Shortly after that, we had a |
| 10:43AM 20 | recording system in.  But it didn't start on January |
| 21 | 1st.  And I wasn't the -- I wasn't the bond judge, but |
| 22 | I'll tell you it didn't start on January 1st like the |
| 23 | court mandate. |
| 24 | So I went to the circuit judges' meeting |
| 10:43AM 25 | and I told every circuit judge, "You do not have a |



1    recording system in the Benton County Jail and it

2    should have started January 1st."  And that's all --

3    that was expressed to them.  And so I record them, but

4    it didn't start on January 1st.

10:44AM   5    Q.    So there currently is some kind of a mechanism

6    to record all of them?

7    A.    There is now because I went to the circuit

8    judges, and I encouraged them to get a recording

9    system pursuant to what the Supreme Court said.  So

10:44AM  10   there is now, and I use it.

11   Q.    How does it -- how does that actually work?

12   A.    So the way it works is that the district judge

13   has to log in and then has to get on the app to start

14   the recording.

10:44AM  15   Q.    Where is this recording kept?

16   A.    So it's kept through the county.  And I've

17   inquired about having a court reporter there, but I

18   was told that -- by the administrative judge that

19   there's not going to be a court reporter.  But so

10:44AM  20   there's no court reporter.

21   Q.    This recording system, I mean the physical

22   system itself, is something that the county has?

23   A.    It's stored in a county database or a county

24   cloud, that's correct, and it starts and it's stopped

10:45AM  25   by the district judge.  There's not an independent

FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024                                          25

1   third party there doing it.  It is started and stopped

2   by the district judge himself.

3   Q.    Okay.  Whenever -- whenever you do these bond

4   hearings, the -- you know, one of the main things is

10:45AM  5   the court rules that you have to follow.

6             What is it that you do?  If somebody

7   comes up there, let's just say he's charged with

8   felony possession of meth, just a simple, I mean, drug

9   case, and he comes up there and he's standing in front

10:45AM  10  of you.  Tell me what all you say to him.  What do you

11  do?

12  A.    Okay.  So I follow the Administrative Rules 8.1,

13  8.2, and 8.3, which is a first appearance.  So I

14  follow the first appearance rules.

10:46AM  15            I advise them of their Miranda rights.  I

16  tell them what their charges are, the number of

17  charges and the classification.  I then inquire into

18  the facts that are outlined like employment, where do

19  you live, and go through some inquiries that would

10:46AM  20  impact on whether someone's pretrial release on a

21  citation or is required to have a bond.

22            Based upon that inquiry, I then set a

23  bond, and after I've set a bond, I then go through the

24  indigency form that isn't the same as what is used in

10:46AM  25  circuit court because we don't have -- we don't have a

1    Notary to notarize it.  It's a different form, but

2    it's an indigency form that the district judges use

3    and then I make a determination -- well, I ask them if

4    they want an attorney, and if they do, then I go

10:47AM   5    through the questions and appoint them one if they

6    qualify.  And I have done that from the first day I

7    was a judge.

8              I will say that that was not being done

9    in the many years prior.  But when I became the judge,

10:47AM   10   I was insistent that we were going to appoint public

11   defenders at the first hearing, and that's what I do.

12   And I definitely encourage people to consider a public

13   defender and tell them that even if you get one, you

14   can hire private counsel.

10:47AM   15             And I tend to find that people think

16   it's an either/or, and I try to make sure that they

17   know if you get a public defender, you can still hire

18   any attorney you want.  So I always try to -- I always

19   consider someone getting a public defender in any

10:48AM   20   felony case I have.

21   Q.    What is the criteria that you use to determine

22   whether a person is actually indigent?

23   A.    So the criteria is:  Are you employed; if you

24   are employed, how much do you make.  If you're not

10:48AM   25   employed, I ask if you get government assistance or a



1    disability check or some type of monthly check.  I

2    also inquire if they have any cash or any money in a

3    checking account.

4           Now, if you don't have a job and you

10:48AM  5    don't have any cash and you don't have any money in

6    your checking account, I don't start asking about

7    401(k)s and go into houses, and I tend to get a feel

8    that if you don't have a job, you don't have any

9    money, there's no reason to continue with a more

10:49AM  10   litany of questions.

11          But if you do have a job and you do have

12   a salary or a monthly amount and you do have money in

13   your checking account, I may inquire a little bit

14   further, but I'm always trying to find out if you have

10:49AM  15   enough to appoint an attorney, and I always err on the

16   side of appointing someone a public defender.  And I

17   would say when people want an attorney, I probably

18   appoint them more than 95 percent of the time.

19          It's extremely rare that I find someone

10:49AM  20   is not indigent.  Probably 95 percent-plus of the

21   people I do find indigent because I think that if I'm

22   going to err, I should err on the side of getting them

23   an attorney.

24   Q.    Okay.  You said that you, you know, favor the

10:50AM  25   public defender being there.

```
 1   A.      I do.
 2   Q.      Why?   What is it that the public defender would
 3   do on the day-to-day cases that would assist you?
 4   A.      Well, first of all, I have to continually remind
 5   people that you have the right to remain silent when
 6   they want to talk about the facts of the case, and
 7   some people will think they are helping, but they
 8   actually are partially incriminating themselves.  And
 9   I think it's important that the court system is being
10   aware of what people are saying in terms of the facts
11   of the case.
12             I feel a public defender could be
13   helpful because the public defender would be able to
14   maybe have a little more influence over whether the
15   person is going to talk about the facts of the case.
16   Q.      Whenever you -- you know, I mean, I've gone
17   through this, you know, the criteria of this stuff
18   that you're supposed to go through, and there's some
19   of the stuff, it's about -- you know, you have to make
20   a determination at some point of the strength of the
21   State's case.
22   A.      And I make that a factor in my cases, and I made
23   it a factor in these two particular cases that we're
24   talking about.
25   Q.      Okay.   Whenever -- but, you know, it says that
```

10:50AM (line 5)
10:50AM (line 10)
10:51AM (line 15)
10:51AM (line 20)
10:51AM (line 25)



**www.ArkansasRealtimeReporting.com**

 1    there are -- people can put in any facts that they

 2    want, you know, basically about those issues.

 3              How is it that anybody ever does that,

 4    you know?  I mean, how does the defendant know to even

10:52AM    5    explain, you know, certain facts to you that would

 6    make it to where you might not even find probable

 7    cause?

 8              Let me give you an example of this.

 9    Recently we had a case which is, you know, extremely

10:52AM   10    rare obviously.  Police officer has a PC affidavit,

11    and he says in the affidavit, "I 100 percent

12    identified this guy is the person," he himself.

13              Then it was found out -- so a warrant

14    was issued for that.  He was, you know, subject to

10:52AM   15    that warrant.  Come to find out, he actually was in

16    custody in South Carolina at the time of the crime.

17    Could not possibly have been him.  Subsequently the

18    case was dismissed.

19              So I can understand how you would read a

10:52AM   20    PC affidavit and go, "Well, this looks pretty good to

21    me."  I mean, you've got extensive experience in this

22    --

23    A.    Can I --

24    Q.    But if a lawyer came in there and said, "Look,

10:52AM   25    Judge.  Some of this PC information is incorrect."

1    What I'm trying to get to is:  How would a defendant

2    who doesn't have a lawyer ever be able to persuade you

3    that probable cause doesn't exist?

4    A.    So in your hypothetical, does your hypothetical

10:53AM    5    cover a hit-and-run in Gentry?

6    Q.    Is what?

7    A.    Was it a hit-and-run in Gentry in your

8    hypothetical?  Was that the case?  Was it an actual

9    case?

10:53AM    10    Q.    Isn't that the guy that got into a car wreck and

11    is a fleeing?

12    A.    In the City of Gentry?

13            MS. LEE:  I don't know what city it was

14        in.

10:53AM    15            THE WITNESS:  Okay.

16            MR. NORWOOD:  I don't remember that part

17        of it.

18    A.    So --

19            MS. LEE:  And I don't think either one

10:53AM    20        of us remembers who the bond judge.  You're

21        just giving him an example.

22    Q.    Oh, no.  Not you.

23            MS. LEE:  I don't think it was you.

24    Q.    What I'm saying is it's just an example.

10:53AM    25            MS. CRYER:  I was going to say to the



FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024

31

|  | | |
|---|---|---|
| | 1 | extent that we are talking about actual |
| | 2 | facts of an actual case. |
| | 3 | THE WITNESS:  That's what I'm trying to |
| | 4 | clarify.  Are you -- |
| 10:53AM | 5 | MS. CRYER:  That may still be pending, |
| | 6 | then I would object to that. |
| | 7 | THE WITNESS:  I was just trying to |
| | 8 | clarify if it's an actual case. |
| | 9 | Q.    Oh, it is an actual case. |
| 10:54AM | 10 | A.    Okay.  I'm trying to get clarity.  If you're |
| | 11 | giving me a hypothetical, made-up hypothetical or if |
| | 12 | you're really giving me an actual case and you're just |
| | 13 | calling it a hypothetical, and I guess that's where |
| | 14 | I'm asking for the clarification. |
| 10:54AM | 15 | Q.    Let's just -- let's just start all over. |
| | 16 | What I'm trying to get to is defendants |
| | 17 | are in custody.  They don't have the ability to do a |
| | 18 | lot of things that lawyers can do, like go herd up a |
| | 19 | bunch of dang witnesses and get them to the hearing at |
| 10:54AM | 20 | 6:00 in the morning, okay? |
| | 21 | A.    So I will not allow witnesses at the Rule 8.1 |
| | 22 | first appearances because I don't have authority to |
| | 23 | conduct those type of hearings.  Those are -- those |
| | 24 | are not first appearances hearing. |
| 10:54AM | 25 | First appearances hearings are |

1   nonadversary and they're informal, and what that means

2   is it's not meant to have witnesses called.  If that

3   happened and someone wanted to call a witness, I then

4   notify Administrative Judge Tom Smith and say, "You

10:55AM   5   have someone who wants to call witnesses at a bond

6   hearing," and I would ask that either Judge Karren or

7   Judge Green take this case to have a court reporter

8   present.

9        I'm of the opinion that first

10:55AM   10   appearances are nonadversary and they're informal, and

11   that is words for not witnesses testifying and there's

12   no cross-examination.  So first appearances are not

13   meant to have witnesses called and have

14   cross-examination.  That's not what a first appearance

10:55AM   15   is because the first appearance is nonadversary.  It's

16   a probable cause determination.  And under the Rule,

17   it's nonadversary.

18        So if I was in that scenario, I would

19   then ask that the administrative judge would have this

10:55AM   20   with a court reporter because if we're taking

21   testimony and cross-examination, that needs to -- that

22   needs to have a court reporter present in my opinion.

23        And so I would probably reset the

24   hearing, and I would ask that the administrative judge

10:56AM   25   would have either Judge Karren or Judge Green do that,



**www.ArkansasRealtimeReporting.com**

         1    just like I have on a attempted capital murder case

         2    that I felt was important that we have a transcript,

         3    and at that time, we weren't recording.

         4             So when I get to a certain point where I

10:56AM  5    feel like it's a Class Y felony scenario or someone

         6    wants to call witnesses, which has never happened, I

         7    would actually reset the hearing to later in the day

         8    and ask that administrative judge would have

         9    Division 1 or Division 2 do it.  Because what I'm

10:56AM 10    conducting is a nonadversary hearing, an informal

        11    hearing, and that's pursuant to the rule.

        12             So that's the important part of where,

        13    as a district judge, I have to only do what I'm

        14    allowed to do, and a first appearance is a

10:57AM 15    nonadversary proceeding.  So I've never had an

        16    attorney want to call a witness.  I've never had them

        17    ask, but I would have extreme caution before I would

        18    allow witnesses to be called and then have

        19    cross-examination going on in a nonadversary

10:57AM 20    proceeding because I don't know how it could be

        21    nonadversary if there's being witnesses called and

        22    cross-examination.

        23    Q.    Okay.  Say I show up, a lawyer, any lawyer shows

        24    up, and I assume that you let the lawyer see the PC

10:57AM 25    affidavit?



1    A.    I do, and I generally encourage them to go ahead

2    and take a picture of it and screenshot it so they can

3    not just read it in realtime, but I like them to walk

4    out so they have a copy.  So I always hand it to them

10:57AM    5    and encourage them to take a screenshot so that way

6    they have a copy they can leave with.

7                I don't have a copy machine in there.  I

8    can't make them a copy, but I definitely let them read

9    the affidavit.

10:58AM    10    Q.    But you would -- you would listen to an argument

11    from a lawyer that there was something wrong with the

12    PC affidavit?

13    A.    Hundred percent.

14    Q.    So if I get up there as a lawyer and I go, "Your

10:58AM    15    Honor, this is a really good case, but it did not

16    happen in Benton County" by the actual statement of

17    the deputy that's made the statement and you go,

18    "Well, I agree"?

19    A.    I would listen to any argument, and I would

10:58AM    20    encourage the attorney to make a diligent argument for

21    their client.  I'm a neutral and detached judge.

22    Q.    Hold on just a second.  Okay.  In Rule 8.5 --

23                MR. NORWOOD:  I have copies of the

24            rules.  Does anybody need them?

10:59AM    25                MR. BRASCHER:  Yes, please.



```
              1              MR. NORWOOD:  Okay.  Here's the stack
              2        that I'm going off of.
              3              MS. CRYER:  Thank you.
              4              MR. BRASCHER:  Thank you.
10:59AM       5              MS. CAMPBELL:  Thank you.
              6              MR. NORWOOD:  This is how I do make a
              7        little bit of money.  I charge $25 for
              8        these.
              9              MR. PARRISH:  I don't need a copy.  I've
10:59AM      10        got one.  Thank you.
             11              MR. NORWOOD:  Those are cartoons.  I
             12        know what you're doing over there.
             13              MS. CRYER:  The benefit is I sign these
             14        and hand them back to you, so you have my
10:59AM      15        signature.  We're working with 25 bucks at
             16        that point.
             17   Q.   Okay.  Let's go down to (b)(iv).  It says:  "The
             18   inquiry should take the form of an assessment of
             19   factors."  And this one is his character and
10:59AM      20   reputation.
             21              How do you normally -- how do you expect
             22   somebody to prove that they have a good character or
             23   reputation without a witness?  I mean, is it something
             24   that you would ask the defendant?  I mean, I would
11:00AM      25   think that you could do that.  You could say, "Well,
```

FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024                                                    36

1    do you have a good character and" -- and they go,

2    "Well, no, not really.  I've been coming to prison

3    three times.  I'm -- you know, I'm going to steal your

4    shirt if I can."

11:00AM  5    A.    So I generally don't ask that.  That is very

6    likely to cause someone to incriminate themselves,

7    potentially if you are asking that question and they

8    are giving you an answer.

9              So generally I'm not going to that

11:00AM  10   particular question and insisting that they answer

11   that particular question.

12   Q.    Well, see, that's where I was trying to get to

13   in the other thing.  If I brought -- you know, I show

14   up at 6 o'clock and I bring a really well-known,

11:00AM  15   respectable citizen that would say, "Yeah, I know

16   Joey.  He got drunk and, you know, he burglarized that

17   building, but other than that, he's got a good

18   character and reputation."

19             And you're telling me that you could --

11:00AM  20   we could do that, but it would be after you contacted

21   the administrative law judge?

22   A.    What I'm saying is this, is that --

23             MS. CRYER:  Objection.  Form.

24             Go ahead.  You can answer.

11:01AM  25   A.    What I'm saying is that if we're talking about

FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024                                              **37**

```
 1   the witness being about the facts of the case --
 2   Q.    Well, you're talking about the probable cause
 3   determination.
 4   A.    Well, I know, but that's why I'm stating to you
 5   that you can have a witness that wants to talk to the
 6   facts of the case and say -- testify that, "I was with
 7   them.  I'm an alibi witness."
 8            And if we were going to get into the facts
 9   of the case, that's where I would contact the
10   administrative judge, if we were going to argue about
11   facts of the case, or if the Court were going to hear
12   arguing about the facts of the case.  Which is
13   different than someone just wanting to talk generally
14   about reputation.
15            But I've never had someone come before
16   me and actually want to talk specifically about that.
17   I generally would have someone say, "I have present
18   with me the family member that is present that will be
19   involved with making sure he gets to the next court
20   date."
21   Q.    You'd allow that testimony, correct?
22   A.    Well, I have -- it would be coming from the --
23   it would be coming from the private attorney, and the
24   private attorney would be able to say, "I have someone
25   that can take responsibility."
```

11:01AM (line 5)
11:01AM (line 10)
11:02AM (line 15)
11:02AM (line 20)
11:02AM (line 25)

```
 1    Q.    Oh, and so you just say, "Hey, that's his mother

 2    over there and she said she will take him and" --

 3    A.    And we have someone that is going to make sure

 4    he makes his court dates, that he's going to live with

 5    his mom and then she's going to get him to court, and

 6    I have her here.

 7              And so I've had family members show up,

 8    and a private attorney could definitely reference

 9    that.  But what I'm specifically saying is that I

10    would caution about getting into and hearing detailed

11    testimony about the facts of the case because that's

12    not what the Rule 8.1 hearing is for.

13    Q.    I understand.

14    A.    It's not supposed to be not -- it's supposed to

15    be nonadversary.

16    Q.    Well, the next one down, which is xi, (B)(vi),

17    it says:  "The nature of the current charge and any

18    mitigating or aggravating factors that may bear on the

19    likelihood of conviction and the possible penalty."

20              I would assume that that encompasses the

21    facts of the case, though.  Am I wrong on that?

22    A.    Well, the affidavit would be something that I

23    would review, that I could look for mitigating and

24    aggravating factors in the affidavit.

25    Q.    No, no, no, no.  I'm talking about -- so that's
```

11:02AM appears at line 5
11:03AM appears at line 10
11:03AM appears at line 15
11:03AM appears at line 20
11:03AM appears at line 25



```
        1   only the -- okay.  You have the executive branch,

        2   which is the prosecutor, and then you have the

        3   defense.  So if you're looking at just what the

        4   executive branch is putting forth, which is the

11:04AM 5   probable cause affidavit, and you're not allowing the

        6   defense to put forth any mitigating, I mean, the

        7   prosecutor's not going to put mitigating

        8   circumstances.  That's going to have to be --

        9   A.    Well, they're obligated.

11:04AM 10  Q.    Huh?

        11  A.    They're obligated to state mitigating factors.

        12  A prosecutor is not allowed in any way to hide

        13  mitigating evidence.  So prosecutors should not be

        14  hiding mitigating evidence.

11:04AM 15  Q.    But what I'm trying to get to is I'm the lawyer,

        16  I show up, and I have a witness that would testify

        17  either -- I mean, to mitigating factors that would

        18  bear on the likelihood of conviction and the possible

        19  penalty.

11:05AM 20         Then it looks to me like we're going to

        21  have to have a witness to do that and then you're

        22  going to have to -- you're telling me that we'd have

        23  to go to Tom Smith, the administrative circuit judge,

        24  and get another hearing date?

11:05AM 25  A.    So what I'm telling you is that you have to
```



| | | |
|---|---|---|
| | 1 | distinguish a first appearance from a preliminary |
| | 2 | hearing.  There's a distinguish between a first |
| | 3 | appearance and a preliminary hearing.  The State of |
| | 4 | Arkansas uses a first appearance.  Some jurisdictions |
| 11:05AM | 5 | use preliminary hearings. |
| | 6 | So generally when testimony is being |
| | 7 | given and there's cross-examination, that's generally |
| | 8 | a preliminary hearing.  That's generally what you call |
| | 9 | preliminary hearings is when it's adversarial.  The |
| 11:05AM | 10 | general terminology is a preliminary hearing. |
| | 11 | What I conduct is a first appearance. |
| | 12 | And so when you look at the case of Gerstein versus |
| | 13 | Pugh where the Supreme Court was making a distinction |
| | 14 | between a public defender having to be at a |
| 11:06AM | 15 | preliminary hearing under Coleman versus Alabama, yes. |
| | 16 | Under Coleman versus Alabama, if it's a |
| | 17 | preliminary hearing, which is adversarial, a public |
| | 18 | defender has to be appointed.  But Gerstein versus |
| | 19 | Pugh is very clear that a probable cause determination |
| 11:06AM | 20 | is nonadversary, and it specifically says that a |
| | 21 | probable cause hearing is a -- is not a critical |
| | 22 | stage.  And that's what Pugh says. |
| | 23 | Q.    Okay.  I understand that. |
| | 24 | A.    I'm conducting the probable cause hearing which |
| 11:06AM | 25 | is nonadversary under Rule 8.1.  I'm not conducting a |



1    preliminary hearing, which is where witnesses would be

2    called and cross-examination is taking place.  So I

3    don't conduct preliminary hearings.  I conduct first

4    appearances, which are cases that are nonadversary in

11:07AM    5    which public defenders are not mandated because it's

6    not a critical stage.

7    Q.    I would agree with that under federal law, but

8    this is the Rules of Criminal Procedure that the

9    Supreme Court of Arkansas says.

11:07AM    10    A.    Which is modeled off the case of Gerstein versus

11    Pugh --

12    Q.    I agree.

13    A.    -- from 1975.

14    Q.    But it says in Section A:  "A pretrial release

11:07AM    15    inquiry shall be conducted by the judicial officer

16    prior to a first appearance."

17           And then B says:  "The inquiry should

18    take the form of an assessment of factors," and it

19    lists the factors, and then one of the factors is

11:07AM    20    mitigating evidence.

21    A.    And then it says --

22    Q.    And so what you're telling me is the defendant

23    cannot come in there with mitigating evidence.

24    A.    I'm not saying that.  I'm saying that if

11:08AM    25    witnesses wanted to be called about the facts of the

|         |    |                                                             |
|---------|----|-------------------------------------------------------------|
|         | 1  | case, then I would confer with Judge Tom Smith because      |
|         | 2  | Rule 8.3 says that the judicial officer, if unable to       |
|         | 3  | dispose of the case at the first appearance, shall          |
|         | 4  | proceed to decide the question of pretrial release of       |
| 11:08AM | 5  | the defendant.  In so doing, the judicial officer           |
|         | 6  | shall first determine by an informal nonadversary           |
|         | 7  | hearing whether there is probable cause for detention.      |
|         | 8  | So I have to conduct it informal and                        |
|         | 9  | nonadversary.  That's what I am limited to.  There is       |
| 11:08AM | 10 | nothing in the rules that says that I'm specifically        |
|         | 11 | allowed to have testimony over the facts of the case        |
|         | 12 | in a first appearance.                                      |
|         | 13 | Q.    What is the purpose of y'all recording the, you       |
|         | 14 | know, the hearings as opposed to having a court             |
| 11:09AM | 15 | reporter?                                                   |
|         | 16 | A.    You'd have to ask the Supreme Court that.  I          |
|         | 17 | didn't write the rule.  It's the Supreme Court that         |
|         | 18 | wrote the rule.                                             |
|         | 19 | Q.    Okay.  Now let's talk about assessments.  What        |
| 11:09AM | 20 | is the primary purpose of setting bail on anybody?          |
|         | 21 | A.    To ensure that they make all their court              |
|         | 22 | appearances on that case.                                   |
|         | 23 | Q.    Okay.  Now, whenever you have someone who is          |
|         | 24 | a -- somebody that's got a criminal record and they've      |
| 11:09AM | 25 | made every prior court appearance in felony cases, as       |

FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024

**43**

```
  1   you well know, we have people that walk into that

  2   Benton -- shocks me, will walk into that Benton County

  3   courthouse and plead guilty to 30 and 40 years of --

  4   and they are out on bail, and I'm going, "Why is this

11:10AM  5   guy not getting on the next boat to Mexico where he's

  6   from?  He's an illegal here in the United States.  Why

  7   is this guy showing up for court?"

  8              So we know that people show up for court

  9   that are in trouble, and they have a track record of,

11:10AM 10   "Yes, I've been in trouble here.  I showed up, I

 11   showed up, I showed up," kind of like Abigail Farella.

 12              All that paperwork about her in the

 13   probable cause affidavit didn't indicate that she

 14   failed to appear on all of those criminal cases.  How

11:10AM 15   do you factor all that in?

 16   A.    Well, she lived out of state, and that's one of

 17   the factors that I consider.  If you live outside

 18   Benton County, that's a factor.

 19   Q.    No, no.  I don't mean that.  I'm talking about

11:10AM 20   just the fail to appear.

 21              You have a guy that shows up and you

 22   look at him, and you're the judge and you're looking

 23   down.  And this guy's been in Cummins prison two or

 24   three times and he's been in trouble for 30 years, but

11:10AM 25   he showed up for court every single time in 30 years,
```



11:11AM

1  and all of those crimes.  Do you count that in his
2  favor.
3  A.    Of course.  If you come to court on your prior
4  court cases, that goes in your favor.  If you don't
5  come to court on your prior cases, it goes against
6  you.
7  Q.    Obviously.
8  A.    If you show up for your prior court cases, it
9  goes for you, but that's only one factor.

11:11AM

10  Q.    Okay.  But if you have -- you have a client -- I
11  mean a defendant who's standing there and he goes,
12  "Well, Judge, I've been in all this trouble, and I've
13  showed up for every single court date," do you take
14  him at face value that that's true?

11:11AM

15  A.    I'll tell you that I don't trust anybody 100
16  percent.  Nobody gets a pass on 100 percent trust.  I
17  don't believe cops just because they're cops.  I don't
18  believe anybody 100 percent.
19          So when you use the word do they get a

11:12AM

20  pass, I'm not really sure what that means, but I don't
21  take anything at 100 percent guaranteed value.  I take
22  everything in the totality before I make a
23  determination of whether I think that person's telling
24  the truth or not.

11:12AM

25          But even if they are, they may actually



```
      1   believe they are coming to the court date, but I know

      2   some people who on day one say they are going to come

      3   and mean it and then you get to the day and they

      4   don't.

11:12AM  5         So even people that say they are going

      6   to come to court, saying you're going to come to court

      7   doesn't actually mean you're going to come to court.

      8   And in our district court, we have 35 percent of the

      9   people that don't show up for arraignment.  And so I

11:12AM 10   can tell you that there's a lot of people that don't

     11   come to court.

     12         And so just because they say it doesn't

     13   mean it happens.  And that's just human nature.

     14   Q.   But if a lawyer could be able to pull off the

11:13AM 15   court records off of Court Connect and show you, "Yes,

     16   your Honor, they have been in court five different

     17   times, five different jurisdictions, and here is the

     18   paperwork to show that they showed up every single

     19   time.

11:13AM 20   A.   That would be taken into consideration and that

     21   would be much helpful information for the Court.

     22   Q.   But that's something that the defendant can't

     23   do.  It would have to have -- you'd have to have a

     24   lawyer to pull that off, don't you think?

11:13AM 25   A.   I don't know if you'd have to have a lawyer.
```



|  |  |  |
|---|---|---|
|  | 1 | All I can tell you is that I will listen to what |
|  | 2 | people have to say, but just because someone tells me |
|  | 3 | something doesn't mean I believe it 100 percent, |
|  | 4 | automatically. |
| 11:13AM | 5 | Q.    I understand.  Okay. |
|  | 6 | Okay.  In Section 8.5(b)(ix) says, "Any |
|  | 7 | other facts to indicate that the defendant has strong |
|  | 8 | ties to the community and is not likely to flee the |
|  | 9 | jurisdiction."  Where would that kind of |
| 11:14AM | 10 | information -- what would it take for somebody to |
|  | 11 | convince you that a person is not -- has strong ties |
|  | 12 | to the community and not likely to flee? |
|  | 13 | A.    Well, if a mother and father came to the bond |
|  | 14 | hearing and were present, which I do have happen.  I |
| 11:14AM | 15 | have family members show up without even an attorney |
|  | 16 | present, just family members that want to come to the |
|  | 17 | bond hearing.  If family members come to the bond |
|  | 18 | hearing and they're present and they're watching the |
|  | 19 | bond hearing for this particular person, then to me |
| 11:14AM | 20 | that's a factor that we have someone that's taking |
|  | 21 | enough interest that -- |
|  | 22 | Q.    So you take that into consideration? |
|  | 23 | A.    That's definitely a positive.  If you have a |
|  | 24 | family member showing up at your bond hearing, that's |
| 11:14AM | 25 | a positive because to me, that increases the |

|  | 1 | likelihood you'll show up when you have someone else |
|---|---|---|
|  | 2 | that's going to assist you in getting to court. |
|  | 3 | Or even if they don't physically take |
|  | 4 | you there, they keep reminding you.  So if family |
| 11:15AM | 5 | members show up, that's a positive.  Or -- |
|  | 6 | Q.    What if you have somebody -- |
|  | 7 | A.    -- releasing them without a bond.  That would go |
|  | 8 | in their favor of going towards the release on a |
|  | 9 | citation. |
| 11:15AM | 10 | Q.    What percentage of the cases do you think |
|  | 11 | that -- if the prosecutor has made a bond |
|  | 12 | recommendation of money, how many of those cases do |
|  | 13 | you cite out, do you think?  Just give me a rough |
|  | 14 | idea. |
| 11:15AM | 15 | A.    That they've given me a bond? |
|  | 16 | Q.    Yeah.  They're saying, "I want you to have |
|  | 17 | $5,000 on this guy."  What are the odds that that |
|  | 18 | person would get cited out? |
|  | 19 | A.    It would definitely be -- if it's only a $5,000 |
| 11:16AM | 20 | bond, I would -- I cite out many people on a $5,000 |
|  | 21 | bond.  I've cited out someone on a $75,000 bond |
|  | 22 | before.  And the same day that Logan Murphy came, |
|  | 23 | there was an individual that I cited out that day, on |
|  | 24 | that day, and I gave him a citation.  He had a bond of |
| 11:16AM | 25 | 17,500 recommendation, and I cited out David Yurgil on |



1    that same day as Logan Murphy.  I cited out a bond

2    recommendation of 17,500.  I cited him out based upon

3    the mitigating circumstances and -- in that particular

4    case.

11:16AM    5    Q.    Now, whenever --

6    A.    So it happens.  I cite people out even though

7    there's a bond.  Doesn't mean law enforcement likes

8    it, but I do it.

9    Q.    Whenever you have -- you're going to require a

11:17AM    10    bond of some sort, do you ever allow people to do just

11    signature bonds?

12    A.    Where --

13    Q.    Where somebody would come in --

14    A.    -- they are just signing --

11:17AM    15    Q.    Yeah.

16    A.    -- a piece of paper saying "If I don't show up,

17    I owe this much money."

18    Q.    Yeah.  Well, basically, yes.  But, I mean, it

19    may be cosigned by somebody else.

11:17AM    20    A.    Well, I mean, they're cash/corporate surety.

21    That's what I --

22    Q.    No, no.  I'm talking about, you know, you just

23    have a -- it just says a bond, "I hereby agree to pay

24    the Court $500 if I don't show up" or that --

11:17AM    25    A.    No.  I don't issue those.



1    Q.    Did you know that that was the primary way that

2    we used to do that before you?

3    A.    Well, I might ask what year you're referring to.

4    Q.    Well, I mean, back when I did it back in '87.

11:17AM  5    A.    Well --

6    Q.    I wonder why that they got away from that.  So

7    you just don't do that under any circumstances?

8    A.    Well, as being with the police department in

9    1996 and going back 28 years, I can say it's -- in 28

11:18AM 10    years of being either a police officer, defense

11    attorney, prosecutor or a judge, I would say that's

12    extremely rare in the last 28 years.

13            Now, what happened in the 1980s, I mean,

14    I was in middle school and high school, so --

11:18AM 15    Q.    Feeling old all of a sudden.

16    A.    Well, I just don't really know when I was in

17    middle school --

18    Q.    You know the rules --

19    A.    -- how the State -- I have no idea as a middle

11:18AM 20    schooler in Illinois and Indiana.  I have no idea

21    what's going on in Benton County.

22    Q.    But that's actually an option that you have,

23    isn't it?

24    A.    Yeah, a hundred percent is.

11:18AM 25    Q.    It is?



1    A.    (Nods head up and down.)

2    Q.    Then why don't you ever use that, if that's

3    literally an option the Supreme Court has approved of?

4    A.    Because I feel like bondsmen are very beneficial

11:18AM    5    in getting someone to court because if someone misses

6    court, a bondsman has a financial stake in getting

7    that person there.

8    Q.    Okay.    Let's go to Rule 9.1.    Under (b)(i) or

9    (b)(1), says:    "Place the defendant under the care of

11:19AM    10    a qualified person or organization agreeing to

11    supervise the defendant and assisting him in appearing

12    in court."

13          Do you ever do that?

14    A.    I don't have a mechanism to have people sign

11:19AM    15    paperwork or do that.    So, no, I don't actually place

16    the defendant under the care, no.    We don't have any

17    pretrial probation officers or pretrial staff that is

18    available for the district judges at bond hearings.

19    So, no, I don't do that.

11:20AM    20    Q.    Okay.    Let's go down to 4.    It says:    "Release

21    the defendant during the working hours but require him

22    to return to custody at a specified time."

23          Do you ever do that?

24    A.    No.    I mean, that's an administrative hassle,

11:20AM    25    and the jail is overcrowded, and it's over capacity.

11:20AM

1   So booking people in and out, I'm not a big fan of

2   because it allows potential contraband to enter the

3   jail.  So I don't really think that having people

4   coming in and out of the jail every single day is --

5   if someone were to be in that situation, I'd cite them

6   out and just say, "I'm giving you a citation."  I

7   wouldn't want to use that system.  I'd more likely

8   just cite them out.  Rather than making them spend

9   every night in jail, I'd just cite you out like I did

11:20AM

10  on Mr. David Yurgil.

11  Q.    Do you ever make people wear GPS monitors or

12  anything like that, tracking devices?

13  A.    No.

14  Q.    Okay.  Let's go to Rule 9.2.  And this is the

11:21AM

15  one that I think is the hardest for any judge to be

16  able to get around:  "The judicial officer shall set

17  money bail only after he determines that no other

18  conditions will reasonably ensure the appearance of

19  the defendant."

11:21AM

20           What are you doing to make sure that

21  you're in compliance with that?

22  A.    I guess I'm not understanding your question.

23  Q.    Okay.  You can only set money bail when you have

24  determined that no other condition will reasonably

11:21AM

25  ensure the appearance of the defendant.



1                So that means you're going to have to go

2    down the entire list of other conditions that you are

3    considering and rejecting, correct?

4    A.    It's pretty rare that I'm issuing a cash bond,

11:22AM  5    if that's what you're referring to.  Is that -- are

6    you referring to cash bonds?

7    Q.    Well, it doesn't say "cash bond."  It just says

8    "money bail."  I mean --

9    A.    Are you talking about subsection (iii)?

11:22AM  10               MS. CRYER:  I'm going to object to the

11            form, if you can maybe rephrase it.

12   Q.    Okay.  What do you think the term "money bail"

13   means in Rule 9.2(a)?  Do you think that that refers

14   to a cash only, or is that a cash or corporate surety?

11:22AM  15   A.    So it gives three options under subsection (b).

16   So when it says "set money bail," what I look at, is

17   it says:  "If it is determined that money bail should

18   be set, the judicial officer shall require one of the

19   following."

11:22AM  20               So if it's money bail, then cash is one

21   option, but corporate surety is the most common.

22   Q.    I understand it.  Okay.  So you have decided or

23   you're con- -- the prosecutor is recommending a

24   $10,000 bond, where they'd have to go hire a bail

11:23AM  25   bondsman, okay?



1             You, if I understand it right, under

2    Rule A shall set money bail only after you determine

3    that no other condition could possibly reasonably

4    ensure the appearance of the defendant.  So you have

11:23AM  5    to eliminate the conditions that would potentially.

6    Are you doing that in each case.

7    A.    I am.  We don't have pretrial -- we don't have

8    pretrial officers that people can report to.  That's

9    not an option for the Court.  We don't have them.  So

11:23AM  10   some of the options that would be great we don't have.

11   We don't have a pretrial officer where someone could

12   report to on a weekly basis.

13             So some of the things that would be

14   beneficial we don't have.  So one of the challenges is

11:24AM  15   that as a district judge, we don't have some of the

16   options that would be beneficial.  And as an example,

17   a pretrial officer, someone that could be released in

18   the report to the pretrial officer once a week or

19   something like that we don't have in Benton County.

11:24AM  20   And so some of my options are just not available.

21   Q.    Okay.  In this same rule -- it's under

22   Section C -- says that:  "Setting the amount of bail,

23   the judicial officer should take into account all

24   facts relevant to the risk of non" -- and then it goes

11:24AM  25   on, and the next one is:  "The length and character of

1    the defendant's residence in the community."  And then

2    it goes on to his employment status history.

3              I mean, are you making a detailed -- I

4    mean, do you actually sit there -- I mean, it would

11:24AM   5    seem to me to be easy to sit there if you have the

6    rule book opened and look at the guy and go, "Okay,

7    how long have you lived in Benton County" and, you

8    know, "What kind of a job do you have" and, you know,

9    all of that stuff.  Do you actually go through that

11:25AM   10   criteria like that?

11   A.    I don't read it word for word.  I don't ask the

12   person what their mental condition is, for example.  I

13   don't ask someone, "What is your mental condition?"

14             And, I mean, obviously as a judge, we

11:25AM   15   have to be cautious that, to be honest, that we're not

16   embarrassing people and not making people reveal if

17   they have a mental disorder.  And so I am cautionary

18   that there is a degree of privacy that people are

19   entitled to, and as the bond hearing judge, I may not

11:25AM   20   want to have the person list out all their mental

21   conditions.  And so I don't read through this word for

22   word and then ask them the question, "Mr. So-and-so,

23   what is your mental condition," and so I don't read it

24   word for word.

11:26AM   25   Q.    I agree that if I were a judge, I wouldn't do



|  | 1 | that in front of the other inmates, either, okay?  But |
|---|---|---|
|  | 2 | wouldn't you think that experience shows that people |
|  | 3 | with mental conditions are higher, more likely to not |
|  | 4 | show up for court -- you have paranoid schizophrenics; |
| 11:26AM | 5 | you may have people with bipolar disorder -- that if |
|  | 6 | you knew that at the time that somehow or another that |
|  | 7 | that would be able -- you would say, "Well, are you |
|  | 8 | taking your medication?" |
|  | 9 | I mean, you don't have to have everybody |
| 11:26AM | 10 | else in there.  You have the ability to exclude |
|  | 11 | everybody from the courtroom, if I understand it |
|  | 12 | right, correct? |
|  | 13 | A.    If I wanted to have every person brought in one |
|  | 14 | at a time, I could do that. |
| 11:26AM | 15 | Q.    But I would think a mental condition is |
|  | 16 | something that would play heavily into this total |
|  | 17 | picture of whether somebody, one may need a lawyer |
|  | 18 | like Gabriel Delancy having an IQ of 40. |
|  | 19 | A.    That is why I appoint people public defenders at |
| 11:27AM | 20 | the first appearance because I think it's extremely |
|  | 21 | important that at the first contact with a judge, they |
|  | 22 | are being appointed a public defender.  And that's why |
|  | 23 | I always appoint people a public defender if they |
|  | 24 | qualify, and I'm an advocate for people having |
| 11:27AM | 25 | representation. |



|  |  |
|---|---|
| 1 | And so as soon as I'm -- as soon as they |
|  | are having contact with the judicial officer and it's |
|  | me, I'm appointing them a public defender if they |
|  | qualify. |
| 11:27AM 5 | Q.   Okay.  But as we know back, speaking of days |
|  | gone by, I never heard the word "autism" back whenever |
|  | I was at the prosecutor's office.  I mean, that's -- |
|  | and now it seems like a significant number of people |
|  | are on the spectrum of some sort, and you must be |
| 11:28AM 10 | dealing with these people, okay? |

1       And so as soon as I'm -- as soon as they

2    are having contact with the judicial officer and it's

3    me, I'm appointing them a public defender if they

4    qualify.

11:27AM 5    Q.   Okay.  But as we know back, speaking of days

6    gone by, I never heard the word "autism" back whenever

7    I was at the prosecutor's office.  I mean, that's --

8    and now it seems like a significant number of people

9    are on the spectrum of some sort, and you must be

11:28AM 10    dealing with these people, okay?

11       What are you doing -- don't you think a

12    lawyer there at this -- at that hearing would assist

13    these people in trying to talk to you?  They may not

14    even -- you know, me and you talk.  We see each other

11:28AM 15    on the street.  We stand there and talk about all kind

16    of stuff, but somebody that's autistic sees a judge,

17    they may freeze up and not be able to tell you

18    anything that's usable.

19       Do you think that a lawyer being there

11:28AM 20    at the time of the bond hearing would assist the

21    defendant in those circumstances?

22    A.   Yes, and I would prefer that the public

23    defender's office would voluntarily show up at the

24    bond hearings.  I would prefer that.  I think it would

11:28AM 25    be beneficial.



1    Q.    Thank you.  On criminal history, whenever you

2    are looking at the PC affidavits like Farella's, it

3    listed some of the charges and then it says they don't

4    have a disposition of it.  Do you --

11:28AM    5    A.    So I don't consider that.

6    Q.    You don't hold that against them, do you?

7    A.    If it's no disposition, it does not get counted.

8    Q.    Okay.

9    A.    If -- to be considered, it has to be a

11:29AM    10    disposition.  I will not count something that has no

11    disposition.

12    Q.    Okay.  Let's talk about this, the indigency

13    form.  You indicated that there's a different form

14    that they use in circuit court?

11:29AM    15    A.    There is.

16    Q.    What is the difference?

17    A.    The difference is -- is that the form that's in

18    circuit court is being actually filled out by the

19    public -- by the defendant themselves, and they are

11:29AM    20    filling out every word themselves.  When I'm at the

21    bond hearing, I'm not giving the person a pen in front

22    of me and waiting 10 minutes per person to fill out

23    the paperwork.  I'm asking the relevant questions and

24    I'm not giving them a pen and saying "Fill this form

11:30AM    25    out in front of me."  I'm asking the relevant



FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024
                                                                    58

| | |
|---|---|
| 1 | questions. |
| 2 | So what's being handed to Judge Green |
| 3 | and Judge Karren is coming from the public defender's |
| 4 | office to the judge because the people are filling |
| 11:30AM 5 | that out. |
| 6 | Q.    Okay.  I assume that you have the option of |
| 7 | waking them up a little early and giving all of them |
| 8 | an indigent -- a certificate of indigency, let them |
| 9 | prefill it out and so they have got it whenever they |
| 11:30AM 10 | come up there and talk to you and go, "Here's my |
| 11 | indigency form."  Why don't you just do that? |
| 12 | A.    I'm being told that some of that information is |
| 13 | in the kiosk and the jail is not providing it to the |
| 14 | Court, and I'm being told that some of that is in the |
| 11:30AM 15 | kiosk, but it is not being provided to the bond judge, |
| 16 | and I requested it and it's not being provided. |
| 17 | Q.    I understand. |
| 18 | A.    And I think that it's in the kiosk machine. |
| 19 | Q.    And that's at the -- so the issue -- |
| 11:31AM 20 | A.    Some inmates are -- |
| 21 | Q.    -- with that is somebody at the jail -- |
| 22 | A.    Some inmates are filling out that information in |
| 23 | the kiosk.  It's not being made available to the |
| 24 | Court. |
| 11:31AM 25 | MS. LEE:  Would you explain what the |

1      kiosk is for the people who may not deal

2      with law?  Because we all know what kiosk

3      is, but would you explain what that is for

4      the record?

11:31AM   5      THE WITNESS:  All I can say is that the

6      jail has a kiosk.  I've not manually entered

7      anything in, so I can't give you a detailed

8      description.  But there is a kiosk at the

9      jail, and it allows for people to enter

11:31AM  10      information, at least the public defender

11      form.

12      MS. LEE:  Okay.

13      THE WITNESS:  And some of that

14      information may be in the kiosk, but it's

11:31AM  15      not being provided to the bond judge.  It's

16      not being printed off and provided to the

17      bond judge.  So it may exist, but it's not

18      being presented to the bond judge.

19      So I go through the most relevant

11:32AM  20   questions like, "Are you employed, how much do you

21   make, do you have any cash, do you have any money in a

22   checking account."  And so I go through the most

23   relevant questions, and I don't have an actual form

24   that's been filled out by the public -- the public

11:32AM  25   defender form.

ARKANSAS
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

```
 1              I don't know if it's in the kiosk
 2    machine or not, so I'm asking the questions.
 3    Q.     Do you think -- do you think that once the case
 4    goes to circuit court that there is a certificate of
 5    indigency filled out before the circuit judge does the
 6    arraignment?
 7    A.     I think it's -- I think that there is a form
 8    that's hand-filled out by the bond judge, during the
 9    bond hearing, and it's being submitted with the
10    affidavit of probable cause.
11              I think what is happening is that there's
12    now a second form being filled out, and there's a form
13    number 2.  And so the form number 2 is then being used
14    to determine whether there's a user fee or not a user
15    fee because at the bond hearings, we are not making a
16    determination of a user fee.
17              We are appointing them attorney because
18    what happens is within 7 to 14 days of us appointing
19    them a public defender, Jay Saxton is filing a motion
20    for discovery.  And so we are expediting a public
21    defender getting involved with the case by filling out
22    our form.
23              And so by us filling out the form in the
24    bond hearing, it causes the public defender to get
25    notified that day that you have a client.  That day,
```

FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024

61

```
 1    they are being notified, and within 7 to 14 days,
 2    generally Jay Saxton is filing a motion for discovery.
 3    And so when we're at day 14, generally everybody who
 4    is being represented by the public defender's office
11:34AM    5    has a filed motion for discovery in the court file.
 6                Then when you get to the arraignment,
 7    which they have already been appointed, that second
 8    form is being used generally to determine whether
 9    there's a $40 public defender user fee or not.  And so
11:34AM   10    it has a benefit.
 11                But what I'll say is the second form is
 12    generally being used for the determination of a public
 13    defender user fee, and we at the bond hearing, we are
 14    not making that determination of a user fee.
11:34AM   15                We're allowing -- we are having that
 16    determination done by the circuit judge, and we are
 17    not determining whether there should be a user fee.
 18    We're just making sure that we can get them this
 19    representation as quick as possible.
11:34AM   20                And so I know on one of the two cases
 21    here that if you look at the date of the bond hearing,
 22    before noon it had a file mark.  And so we're trying
 23    to expedite getting the cases filed and getting them
 24    assigned to a judge as quick as possible and, very
11:35AM   25    importantly, we're trying to get the public defender's
```



FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024

62

1  office involved with the case immediately.

2                    And the way I know it's actually

3  happening is that within 7 to 14 days on almost every

4  case I've ever checked, Jay Saxton has filed a motion

11:35AM  5  of discovery, almost every case I've checked where

6  there's been an appointment.  So --

7  Q.    But there's a thing called a certificate of

8  indigency, correct?  I mean, there is a --

9  A.    There's a form.  I don't know the name of the

11:35AM  10  form, but there's a form which I think you're

11  referring as what I call the second form, the form

12  that Judge Green and Judge Karren look at.  And that's

13  the form that they then determine whether there's a

14  user fee or not a user fee.

11:36AM  15                    But we use a form that we fill out to

16  expedite them getting a public defender because we

17  don't want -- I don't want someone to have to wait

18  until arraignment to get appointed an attorney.  I

19  want someone who's indigent to get appointed an

11:36AM  20  attorney at the day of the bond hearing, and so we use

21  a form so we can expedite that process.

22  Q.    Okay.  There's a --

23  A.    I don't want to ask the question to every

24  person, "Do you have a child?  How old is your child?

11:36AM  25  Are you divorced?"  And ask all these questions and go

1    over that information when really what I'm just trying

2    to make a determination is do you need a public

3    defender.

4    Q.    Let me tell you where I see the glitch in that.

11:36AM    5    There's a statute called certificate of indigency.  I

6    think I brought a copy of that.  There it is.

7                 MR. NORWOOD:  There's several of them,

8            if y'all need them.

9                 MS. CRYER:  Thank you.

11:37AM   10   Q.    It says:  "Any person charged with an offense

11   punishable by imprisonment who desires to be

12   represented by an appointed attorney shall file with

13   the Court in which the person is charged a written

14   certificate of indigency.  The certificate of

11:37AM   15   indigency shall be in a form approved by the public

16   defender commission" -- the forms that you use in the

17   bail hearings are not so approved -- "and shall be

18   provided by the court in which the person is charged."

19                 So that means the court, who is you,

11:37AM   20   should be providing a certificate of indigency to

21   these people at that initial bond hearing, because it

22   goes on to say in Section -- it's on the second page

23   in the middle of the page:  "The Court shall not

24   appoint an attorney prior to review of the submitted

11:38AM   25   certificate of indigency."



11:38AM

 1          And this is why:  Because that form is a

 2  contract between the defendant and the State, and so

 3  if that is not filled out properly and has all the

 4  other stuff that you have to have on it, then the

 5  State, that they're not that -- there's no contract

 6  entered into.

 7          So whenever the public defender tries to

 8  file for a $500 or a $1,000 fee, they are not going to

 9  be able to do that in the future.  And in the pipeline

10  of your cases, we're talking hundreds and hundreds of

11  thousands of dollars that may be not collectible by

12  the way you're doing it.

13          Now, I'm not saying I'm right.  I'm

14  saying you need to double-check that.  You need to

15  talk to Gregg Parrish and find out if that's a glitch

16  because if that is, y'all need to fix that.

17          Now, I'm not here -- I mean, that's not

18  the gist of our lawsuit, but I'm just saying in the --

19  researching this thing for this depo, I stumbled upon

20  that, and I thought, "Somebody needs to check on

21  that."

22          So let me go over some -- I've got some

23  odd and -- I mean just a list of things that are in no

24  order because that's the way my mind works.

25          MS. LEE:  Can we take a little break so



|  |  |  |
|--|--|--|
| | 1 | I can talk to you for a second? |
| | 2 | MR. NORWOOD:  Oh, yeah.  Sure. |
| | 3 | (Recess from 11:39 a.m. to 11:47 a.m.) |
| | 4 | MR. NORWOOD:  Okay.  Here is Logan |
| 11:48AM | 5 | Murphy's paperwork. |
| | 6 | MS. CRYER:  Okay. |
| | 7 | MR. NORWOOD:  And the sentencing order |
| | 8 | for him.  I'd like to just mark those |
| | 9 | exhibits.  This is Number 1; this is number |
| 11:48AM | 10 | 2. |
| | 11 | (Exhibit 1 marked for identification.) |
| | 12 | (Exhibit 2 marked for identification.) |
| | 13 | MR. NORWOOD:  Okay.  And then here is |
| | 14 | Abigail Farella which is number 3 and here's |
| 11:48AM | 15 | another Abigail Farella, which is number 4. |
| | 16 | (Exhibit 3 marked for identification.) |
| | 17 | (Exhibit 4 marked for identification.) |
| | 18 | Q.    Okay.  These are the exhibits that have the |
| | 19 | paperwork involved in this case that we've been |
| 11:48AM | 20 | talking about.  Okay.  Here is Abigail Farella's. |
| | 21 | You, when you did the bond hearing, the prosecutor |
| | 22 | wanted $2500? |
| | 23 | A.    $25,000 -- oh, 2500 on Abigail, yeah.  Abigail, |
| | 24 | 2500. |
| 11:49AM | 25 | Q.    And you set it at 10,000? |



```
      1   A.      I did.

      2   Q.      Do you remember why?

      3   A.      I do remember why.

      4   Q.      Why?

11:49AM   5   A.      The reason being is that in this particular

      6   case, Abigail lived out of state, and she did not live

      7   in the state of Arkansas and she had no family in the

      8   state of Arkansas.  She was an out-of-state resident

      9   who lived in Missouri, who had a Missouri driver's

11:49AM  10   license.  She was driving a vehicle with a Missouri

     11   tag.

     12           She also had -- I'm not saying she was

     13   convicted, but she had numerous arrests out of

     14   Colorado, particularly Denver and Aurora and another

11:49AM  15   jurisdiction.  So she had numerous arrests in the

     16   state of Colorado.  She lived out of state, drove an

     17   out-of-state vehicle.

     18           In addition, she had five convictions in

     19   the last three years.  They were two theft of

11:50AM  20   properties, they were smuggling contraband into a

     21   prison, and then two other which I presume to be

     22   misdemeanor charges.  And so she had five convictions

     23   within three years, and two of them were theft of

     24   property.

11:50AM  25           And so based upon this being a third
```



1  offense of theft of property and having five

2  convictions in the last three years and living out of

3  state and having no ties to the state of Arkansas that

4  I was aware of, I set her bond at 10,000 because 2500

11:50AM  5  would be for someone who would have no prior

6  convictions and live in Benton County.  That would

7  have been appropriate.

8            If she had gone to Rogers High School

9  and lived in Arkansas her whole life and had family

11:50AM  10  here, 2500 would be appropriate.

11            I will say this, that the particular

12  bond rec that I got from her, the deputy prosecutor I

13  felt was too low, and here's the dynamic I'm at:  Is

14  that if all I do is agree with the prosecutor every

11:51AM  15  time I do a bond hearing, then I'm not neutral and

16  detached.  And if all I did was just rubber-stamp

17  every bond hearing number to the exact number the

18  prosecutor was doing, that would not be doing my job.

19            So if 70 percent of the time I'm setting

11:51AM  20  a lower bond and if 20 percent of the time I'm setting

21  the same bond as recommended, what do I do when the

22  prosecutor's way too low.  And so my job is not to

23  rubber-stamp the prosecutor, and I'm not going to just

24  take every bond and go down by 2,500.

11:51AM  25            I'm going to take every case, look at it



www.ArkansasRealtimeReporting.com

|        |     |                                                            |
|--------|-----|------------------------------------------------------------|
|        | 1   | individually; and under the facts of this case, with       |
|        | 2   | her living out of state and having no ties to here and     |
|        | 3   | having such contacts to Colorado, I felt like a $2,500     |
|        | 4   | bond was inappropriate when she's had five convictions     |
| 11:52AM | 5  | in the last three years.                                   |
|        | 6   | So I'm looking at criminal history; ties                   |
|        | 7   | to the community.  The 2,500 was an inappropriate bond     |
|        | 8   | in my opinion.  And I'm not trying to say that I'm         |
|        | 9   | always right; it's just that my job is to treat every      |
| 11:52AM | 10 | person the same, and people that live out of state and     |
|        | 11  | have ties to states farther away and have that number     |
|        | 12  | of convictions, most prosecutors wouldn't be               |
|        | 13  | recommending 2500.  And so I'm treating all the            |
|        | 14  | defendants, as much as I can, the same.  So I felt         |
| 11:52AM | 15 | that was inappropriate.                                    |
|        | 16  | Q.   I understand.  Now, the sheets that, you know,        |
|        | 17  | are the -- the bond sheet you did -- this is your          |
|        | 18  | signature, correct?                                        |
|        | 19  | MS. CRYER:  Which exhibit are we talking                   |
| 11:53AM | 20 | about?                                                      |
|        | 21  | MR. NORWOOD:  Oh.  Number 3.                                |
|        | 22  | MS. CRYER:  Okay.  Thanks.                                  |
|        | 23  | Q.   It's got a thing for residents.  It's got a           |
|        | 24  | little form here you can fill out.  It's blank.            |
| 11:53AM | 25 | A.   I should have filled that out.                        |



|  |  |  |
|--|--|--|
| 1 | Q. | And you -- same on Mr. -- |
| 2 | A. | I should have filled that out. |
| 3 | Q. | Okay.  And you do now, don't you? |
| 4 | A. | I do now. |

11:53AM  5  Q.    Okay.

6  A.    I'm always trying to do things better and be a

7  better judge and improve the way I'm doing things, and

8  so, yes, I think that the better procedure is to fill

9  that out.

11:53AM  10  Q.    Okay.  Now, I'm going to try to wrap this up as

11  quick as I can because I forgot it's getting to lunch.

12  Let's talk about no-contact orders, okay?  A

13  no-contact order is issued frequently in cases.

14  Domestic violence is probably the ones I see the most

11:53AM  15  of or, you know, some kind of crime of violence.

16              Now, look at -- this is a sample.  This

17  is number 5.

18              (Exhibit 5 marked for identification.)

19  Q.    I just picked this off of the -- of Court

11:54AM  20  Connect.  This has nothing to do with any of the facts

21  of our case.

22              But look at that.  Is that form itself,

23  is that the one that y'all normally use day to day.

24  A.    Three of the four district judges use this form.

11:54AM  25  Jeff -- Judge Jeff Conner does not use this form.



1  Q.    Okay.  Well, let's talk about this form.  This

2  form apparently, if the judge has the option of saying

3  you can't have guns, you know, ammunition and you --

4  and that kind of stuff, right?

11:54AM  5  A.    (Nods head up and down.)

6  Q.    Okay.  Now, do you automatically issue these in

7  certain cases?

8  A.    Not automatically.

9  Q.    Okay.  Let's talk about domestic violence cases.

11:54AM  10  Somebody's come in and they are charged with beating

11  on their wife and they have been arrested.  Normally

12  do you have some form of a no-contact order against

13  the person, to where you don't go up there to her

14  house and you don't --

11:55AM  15  A.    Very, very common.

16  Q.    Okay.  And I assume it would be common in crimes

17  of violence, like somebody, the victim of an armed

18  robbery or something or another and you say, "Look,

19  you can't go back to that -- to that Kum & Go store

11:55AM  20  that you robbed," you know.

21  A.    So aggravated robbery would be in the category

22  that we would consider issuing a no-contact order.

23  Q.    Okay.  Let me -- hand that back, if you would.

24  A.    (Tenders.)

11:55AM  25  Q.    The -- when the people come to you at the --



**www.ArkansasRealtimeReporting.com**

1    these people are herded up and brought into the

2    courtroom.   Do you have any say-so about who it is

3    that you see, or is that just something that the jail

4    people decide these people are the ones on the list?

11:56AM  5    A.    So I look at the list, and I make a

6    determination if I'll see someone, and generally I'll

7    see the people on the list.   But I review the files

8    for an hour, maybe two hours before anybody enters the

9    courtroom.   I read every affidavit word for word on

11:56AM  10   every case, look at every single revoke warrant, white

11   warrant, and I look at everything.

12          And I then make a determination whether

13   I'll see everybody.   Sometimes I refuse to see

14   someone, but, yes, I do get to make the call.   And I

11:56AM  15   review the files for an hour or two and that way when

16   they walk into the courtroom, I've already reviewed

17   the file in the entirety, so that way I'm not doing it

18   right in front of them.

19   Q.    What do you do with the -- this is something

11:57AM  20   that's always perplexed me.   I understand why that

21   there's a -- it takes a couple of days to get a

22   probable cause affidavit, you know, for a warrantless

23   arrest that's been made.

24          But the people that are arrested on a

11:57AM  25   warrant, say for just anything, say a theft case,

**ARKANSAS**
REALTIME REPORTING

www.ArkansasRealtimeReporting.com

FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024
                                                                    72

1   there's already been a probable cause determination or

2   you wouldn't have got the warrant.  Those people are

3   sitting in jail two days like the rest of them.

4   A.    So --

11:57AM   5   Q.    Why is that?

6   A.    So you'd have to ask the deputy prosecutor's

7   office because they make the bond recommendation, and

8   so you have to ask the deputy prosecutor's office.  If

9   you're talking about how quickly a bond rec is being

11:57AM  10   issued by the prosecutor's office, you'd have to ask

11   them.

12   Q.    But you don't always wait for them, do you?

13   There are some cases to where they don't make a bond

14   recommendation and you act?

11:57AM  15   A.    Right.  Because if it comes to my attention, I

16   very well might go ahead and do a bond inquiry and not

17   wait for the bond recommendation because it would --

18   it causes someone to be detained further.

19   Q.    Okay.  Let me go over my list real quick.

11:58AM  20          Isn't it a safe statement to say the

21   other district judges do bond hearings basically like

22   you do?

23   A.    No.

24   Q.    I mean, that's a huge --

11:58AM  25   A.    No, that is not.

FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024

73

1  Q.      What is the major variation then?

2  A.      Three of us do bond hearings in person.  Judge

3  Jeff Conner does them solely through video, and so

4  that's a major difference because myself and Judge

11:58AM  5  Chris Griffin and Judge Ray Bunch, we come and do

6  in-person bond hearings, and Judge Jeff Conner does

7  not.  He doesn't -- he does in -- his through video

8  court.

9          In addition, he records his bond

11:58AM  10  hearings on his own and they are not being

11  independently stored.  So I would say it's inaccurate

12  that all four judges use -- do the same thing.  In

13  addition, Jeff Conner uses a different form than we

14  use for no-contact orders.

11:59AM  15          So I would say it's inaccurate to say

16  all four judges do things the same.  I would say

17  that's inaccurate.

18  Q.      Well, I guess my better question is they are

19  going through the procedures like you, not -- not

11:59AM  20  whether they are doing video, but they are asking the

21  same questions and going --

22  A.      I don't know that.

23  Q.      Okay.

24  A.      I don't attend their bond hearings.

11:59AM  25  Q.      Okay.  That's fine.



Case 5:22-cv-05121-TLB    Document 98-1    Filed 05/01/24    Page 74 of 77 PageID #:
716
FARELLA, ET AL vs DISTRICT JUDGE A.J. ANGLIN, ET AL
ANGLIN, A.J. on 04/05/2024

74

1    A.    I've never seen a Judge Griffin, a Judge Bunch,
2    or a Judge Conner bond hearing, so I can't give you an
3    accurate answer.
4    Q.    Have you recently had contact with Kathryn, who
11:59AM    5    is Judge Green's court reporter, about getting a copy
6    of this bond hearings?
7    A.    No.    I had a conversation with Sandra Saxton,
8    and she said that someone inquired as to how to get a
9    transcript.
12:00PM    10    Q.    How do you do that?
11    A.    I told --
12    Q.    What is the procedure?
13    A.    I told her that I don't download and don't go in
14    and access that information, and it's controlled by
12:00PM    15    the county and that's pursuant to Judge Tom Smith's
16    direction that this is the way it's done, so --
17    Q.    So we could just do a Freedom of Information Act
18    request for it and they could give us a copy, or do
19    you know?
12:00PM    20    A.    I don't know how you get that.    In terms of
21    procedurally, I don't know how you get it.    All I can
22    tell you is that if it's a Division 1 case and it's
23    been assigned to Division 1, you would probably go to
24    the Division 1 court reporter.    If it's been assigned
12:00PM    25    to Judge Brad Karren, you would probably go to the

1    Division 2 court reporter.

2              And so I would say you would procedurally

3    go to the court reporter because Judge Tom Smith said

4    that the transcript would be issued by the court

12:01PM  5    reporter of the appointed judge.

6    Q.    Okay.

7    A.    I would prefer a tran- -- that a court reporter

8    be present in the courtroom and be charged of it would

9    be my preference, but my preference is not being put

12:01PM  10   into place.  And I think that it would be more common

11   sense to have one court reporter report and be

12   responsible for every bond hearing and then that would

13   make it easier for anybody to get the transcript

14   because there would be one person responsible for

12:01PM  15   doing it.  And so that's my recommendation, but it's

16   not been -- it's not been taken up by the

17   administrative judge.

18   Q.    I'm on my last page.  What do you do about

19   translator cases?

12:02PM  20   A.    So we have Spanish.  We have Language Line

21   Solutions.

22              So I went to Judge Tom Smith early on

23   and I said, "I'm at bond hearings and there's no

24   translators."  And so Judge Thomas expeditiously

12:02PM  25   arranged for the jail to use Language Line Solutions.

| | | |
|---|---|---|
| | 1 | And so we have Language Line Solutions that we call a |
| | 2 | 1-800 number and we're able to get all languages. |
| | 3 | I've used Spanish, I've used people from |
| | 4 | Micronesia, I've used them for a person that's from |
| 12:02PM | 5 | Afghanistan, and Language Line Solutions isn't just |
| | 6 | Spanish.  It's all languages.  And so we call a 1-800 |
| | 7 | number, and within 30 seconds to a minute, we have a |
| | 8 | Spanish translator on the phone at the bond hearings. |
| | 9 | Q.    Okay.  So you don't have to rely on the jail |
| 12:03PM | 10 | deputies or something like that to translate? |
| | 11 | A.    I refused to use inmates or deputies. |
| | 12 | Q.    Okay. |
| | 13 | A.    And I thought that that was improper procedure |
| | 14 | and so I will not do that. |
| 12:03PM | 15 | Q.    Okay.  Let me talk to Alison for just a minute |
| | 16 | and hopefully we'll get out of here in a minute. |
| | 17 | (Recess from 12:03 p.m. to 12:06 p.m.) |
| | 18 | Q.    I want to introduce one last exhibit.  This |
| | 19 | is -- I know you've seen this a million times at the |
| 12:07PM | 20 | prosecutor's office.  That's an official form that |
| | 21 | they fill out in circuit court -- I mean, or any time. |
| | 22 | It's called a certificate of indigency, right?  You |
| | 23 | agree that that's what that is? |
| | 24 | A.    It's an affidavit of indigency. |
| 12:07PM | 25 | Q.    Yeah.  I mean, you've seen this many times. |

| | |
|---|---|
| 1 | This is what's used. |
| 2 | A.    This is what I'd like the public defender's |
| 3 | office to show up at bond hearings and have this |
| 4 | filled out by their client so I could review it at the |
| 12:07PM  5 | bond hearing.  I'd be a big fan of that. |
| 6 | Q.    That's the last one. |
| 7 | (Exhibit 6 marked for identification.) |
| 8 | A.    Being presented by the public defender to me, |
| 9 | yes.  That would be beneficial for the court.  I would |
| 12:07PM 10 | rather the questions be answered between the public |
| 11 | defender and the detainee rather than me asking them. |
| 12 | I'd rather that they be responding to their public |
| 13 | defender and then putting the information down and |
| 14 | then me reviewing it and not having to ask everybody |
| 12:07PM 15 | in open court how much money you make and how much you |
| 16 | have in your checking account.  I'd much rather have |
| 17 | that filled out and have the public defender |
| 18 | presenting it to me at the hearing. |
| 19 | Q.    I would agree.  I would think that the public |
| 12:08PM 20 | defender's people have streamlined this thing.  I |
| 21 | mean, they don't show up in circuit court and just |
| 22 | start like they just got there.  I mean, their people |
| 23 | have been getting these forms filled out, all of this |
| 24 | stuff before, you know, they have to go up there to |
| 12:08PM 25 | court.  They don't -- you know, the judge is not |

